UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

IRENE LAND,                        )
                                   )
           Plaintiff,              )
                                   )      No. 4:08CV01354 FRB
                                   )
     v.                            )
                                   )
                                   )
MICHAEL J. ASTRUE, Commissioner    )
of Social Security,                )
                                   )
           Defendant.              )


                    <u>**MEMORANDUM AND ORDER**</u>


           This matter is on appeal for review of an adverse ruling
by the Social Security Administration.  All matters are pending
before the undersigned United States Magistrate Judge, with consent
of the parties, pursuant to 28 U.S.C. § 636(c).

**I.   Procedural Background**

           Ms. Irene Land ("plaintiff") filed an application for
Disability Insurance Benefits ("DIB") and Supplemental Security
Income ("SSI") under Titles II and XVI of the Social Security Act
("Act") on November 2, 2004.  (Administrative Transcript ("Tr.")
46-48; 94-96.)  Plaintiff's applications were initially denied, and
she filed a request for a hearing before an administrative law
judge ("ALJ") on March 4, 2005.  (Tr. 66.)  On September 26, 2006,
plaintiff appeared and testified at an administrative hearing
before ALJ Jhane Pappenfus.  (Tr. 311-49.)  On November 14, 2006,

                               -1-

ALJ Pappenfus issued a decision finding that plaintiff was "not disabled" within the meaning of the Act. (Tr. 15-28.) In so finding, ALJ Pappenfus determined that plaintiff had the severe impairments of asthma and obesity, but did not have an impairment or combination of impairments of listing-level severity. (Tr. 21.) She further determined that plaintiff was unable to return to her past relevant work, inasmuch as such work required that she lift more than ten pounds, and that she was now unable to do so. (Tr. 21, 26.) ALJ Pappenfus determined that plaintiff retained the residual functional capacity ("RFC") for sedentary work,[1] with the need to avoid concentrated exposure to fumes, odors, dusts, gases and poor ventilation. (Tr. 21-26.) The ALJ then continued the sequential evaluation process to step five and applied the Medical-Vocational Guidelines (also "Guidelines" or "Grids") to direct a finding of "not disabled."[2] (Tr. 27.)

Plaintiff subsequently filed a request for review with the Appeals Council. Contrary to plaintiff's assertions in her Complaint and in her brief, the Appeals Council reviewed the ALJ's

_____

[1]Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. 20 C.F.R. § 404.1567(a).

[2]ALJ Pappenfus also determined that, inasmuch as plaintiff had filed a previous application alleging the same impairments, and the Administration had issued an unfavorable decision on May 25, 2004, the doctrine of res judicata precluded consideration of the period preceding May 26, 2004. Plaintiff alleges no error in this determination.

decision and, on August 14, 2008, issued its own decision. (Tr. 8-11.) Therein, the Appeals Council adopted the ALJ's findings at steps one through three, and further adopted the ALJ's conclusion that plaintiff had the residual functional capacity for sedentary work activity, with the need to avoid concentrated exposure to fumes, odors, dusts, gases and poor ventilation. (Tr. 8-9.) The Appeals Council also stated that it agreed with the ALJ's overall conclusion that plaintiff was "not disabled." (Tr. 8.)

However, the Appeals Council disagreed with the ALJ's finding that plaintiff was unable to perform her past relevant work. (Tr. 8-9.) In so finding, the Appeals Council wrote that plaintiff had past relevant work as a registered medical assistant and a medical secretary and that, although she indicated that she performed her medical secretary job at the light exertional level, the functional job duties, as ordinarily required by employers throughout the national economy, are performed at the sedentary level. (Tr. 9.) The Appeals Council concluded that plaintiff was "not disabled" at step 4 of the sequential evaluation process, inasmuch as she was able to return to her past relevant work as a medical secretary. Id.

Plaintiff, in her Complaint and in her Brief in Support, alleges jurisdiction pursuant to 42 U.S.C. § 405(g), which permits this Court to review the Secretary's "final decision." Indeed, this Court's jurisdiction is limited to review of the Secretary's "final decision." 42 U.S.C. § 405(g); Weinberger v. Salfi, 422

-3-

U.S. 749, 765 (1976); see also Browning v. Sullivan, 958 F.2d 817, 822 (8th Cir. 1992) (statutory jurisdiction is confined to review of the Commissioner's final decision).  In the case at bar, this Court's review is limited to the Appeals Council's decision, inasmuch as that decision, not the ALJ's, is the Commissioner's "final decision."  Sims v. Apfel, 530 U.S. 103, 106-107 (2000) (if the Appeals Council grants review of a claim, then the decision that the Council issues is the Commissioner's final decision.)

However, in her brief in support of the Complaint, plaintiff failed to note that the Appeals Council reviewed the ALJ's decision and issued its own decision.  Plaintiff writes: "The Appeals Council declined to review Plaintiff's matter in a decision dated August 14, 2008."  (Brief in Support of Plaintiff's Complaint, Docket No. 18 at 2.)[3]  The Commissioner makes note of this error in his brief. (Docket No. 21, page 2, n. 3.)  Plaintiff continues in her brief to challenge only the ALJ's decision, not the Appeals Council's decision.  Plaintiff alleges error in both the ALJ's RFC determination, and the ALJ's reliance upon the Guidelines at step five.  While the Appeals Council adopted the ALJ's RFC determination, it did not adopt the ALJ's step five findings, and instead determined that plaintiff could perform her past relevant work.

---

[3]In her Complaint, plaintiff also erroneously wrote: "The defendant Agency's Appeals Council denied Plaintiff's Request for Review in a decision dated August 14, 2008."  (Complaint, Docket No. 1 at 2.)

Having noted this discrepancy, the Court scheduled a hearing, which was held on September 10, 2009, with counsel for both parties present. See (Docket Nos. 22 and 23.) During the hearing, the Court noted the foregoing, and addressed with plaintiff's counsel the fact that, despite the fact that the Appeals Council reviewed the ALJ's decision and issued its own decision, plaintiff challenged only the ALJ's decision. The Court asked counsel for plaintiff whether he wished to file a supplemental pleading, and counsel declined, indicating his wish to stand on the brief already filed. See (Docket No. 23.)

## II.  **Evidence Before the ALJ**

A.  <u>Medical Records</u>[4]

The record indicates that plaintiff was treated by Michael Spearman, M.D., from 2002 through 2004 for complaints of shortness of breath and wheezing.[5]  (Tr. 175-200).  Plaintiff

---

[4]Plaintiff had previously filed an application for benefits, which was denied at the administrative law judge level on May 25, 2004.  As ALJ Pappenfus noted in her November 14, 2006 decision, evidence from prior to May 25, 2004 should be considered in order to fully understand plaintiff's condition.  Medical information prior to that date shall therefore be included in the following summary.

In addition, the following summary contains the February 12, 2007 report of Dr. Tipu Sultan, and the July 24, 2007 report of Mr. James England.  Both of these reports were submitted to and considered by the Appeals Council, but were not part of the administrative record before the ALJ.  For the sake of continuity, these reports will be included in the following summary of the medical records.

[5]Due to a combination of poor print quality and poor penmanship, Dr. Spearman's records are largely illegible.  See (Tr. 175-200).  Such illegibility does not, however, require a remand, inasmuch as Dr. Spearman's records predate the relevant time period.

indicated that, from April 14, 2002 through April 20, 2002, she had mild asthma symptoms on three days and moderate symptoms on one; and that her asthma awakened her three times. (Tr. 190.) She also indicated that she took her asthma medication every day, did not require extra medication, and was not working. Id. Pulmonary function testing performed on April 30, 2002 indicated mild restriction. (Tr. 191.) Dr. Spearman's records also indicate that plaintiff's weight was 271 pounds on April 30, 2002 and on June 18, 2002. (Tr. 176.) On May 17, 2002, plaintiff complained of shortness of breath and wheezing. Id. On August 20, 2002, plaintiff had complaints of rapid heart rate, dizziness, and feeling faint. (Tr. 179.) On August 26, 2002, Dr. Spearman noted that plaintiff weighed 345 pounds. (Tr. 175.) On January 2, 2003, plaintiff weighed 260 pounds. (Tr. 185.) In September of 2002, Dr. Spearman wrote "RTW 10/8/02," apparently indicating a return-to-work date. (Tr. 181.) On January 2, 2003, it is noted that plaintiff's weight was slightly over 268 pounds; that she had a forthcoming neurology appointment; that allergy testing had been done; and that plaintiff still had not returned to work. (Tr. 185.) An occult blood test was negative. Id. It appears that she complained of headache and chest tightness. Id. Plaintiff saw Dr. Spearman on January 24, 2003, and on February 12, 2003, at which time her weight was 255 pounds. (Tr. 186.) On March 13, 2003, plaintiff complained of swelling and itching, and there appears to be a reference to mold in the basement of her home, and to a recent

-6-

visit to an allergist. (Tr. 188.) It also appears that it was recommended that plaintiff use Singulair[6] and Ocean Spray (saline nasal spray), and there are also references to Allegra[7] and Benadryl.[8] Id. In April of 2003, it is noted that there was toxic mold in plaintiff's home, and that she was going through litigation. (Tr. 187.) It was also noted that she was no longer taking Prednisone,[9] and that she had last worked in November of 2002. Id. On May 12, 2003, she saw Dr. Spearman for a blood pressure check only. Id. On May 15, 2003, plaintiff saw Dr. Spearman for a consultation. (Tr. 189.) A Ventilation-Perfusion Scintigraphy[10] performed on May 16, 2003 revealed normal ventilation and perfusion images, with no significant interval change from the prior examination dated September 29, 2002. (Tr. 196.) On that same date, a chest x-ray was performed which was normal. (Tr.

---

[6]Singulair, or Montelukast, is used to prevent breathing difficulties and other symptoms associated with asthma and with exercise. It is also used to treat the symptoms of seasonal and perennial allergies.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a600014.html

[7]Allegra, or Fexofenadine, is used to relieve the symptoms of seasonal allergies.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a697035.html

[8]Benadryl, or Diphenhydramine, is used to treat various symptoms of allergies or the common cold; cough caused by minor throat or airway irritation; motion sickness; insomnia; and abnormal movements caused by either early stage parkinsonian syndrome or medication side effects.
ttp://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682539.html

[9]Prednisone is used to treat symptoms associated with low corticosteroid levels, and is also used to treat severe allergic reactions, multiple sclerosis, lupus, and certain conditions that affect the lungs, skin, eyes, kidneys blood, thyroid, stomach, and intestines.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a601102.html

[10]A Scintigraphy is a radiological diagnostic test.
http://www2.merriam-webster.com/cgi-bin/mwmednlm?book=Medical&va=scintigraphy

197.)  On May 22, 2003, plaintiff saw Dr. Spearman in follow-up with test results.  (Tr. 189.)  It is indicated that "X threw her down the steps during 2nd pregnancy," and that plaintiff was sleeping better, but had daily bouts of shortness of breath and was using a nebulizer.  Id.  On September 19, 2003, plaintiff saw Dr. Spearman and reported complaints of leg swelling, and stated that she used a nebulizer three times per day, and that she had been exposed to mold in her house.  Id.

Pulmonary function testing was performed at Forest Park Hospital on January 14, 2004.  (Tr. 223-24.)  It was noted that plaintiff weighed 213 pounds, and that she had good effort and cooperation.  (Tr. 223-24.)  Testing revealed an obstructive pattern of a mild degree, and it is noted that plaintiff had an excellent response to the bronchodilator, which was consistent with her diagnosis of asthma.  (Tr. 224.)

The record includes treatment notes from the Myrtle Hilliard Davis Comprehensive Health Centers, Inc., (also "Davis Clinic") and received treatment from Andrea Thomas, PAC.[11]  (Tr. 201-14.)  On February 6, 2004, plaintiff returned to the Davis Clinic for a check-up and medication refill, and had complaints of vertigo and asthma and hypertension. (Tr. 202.)  She had abdominal pain, and pain under both breasts.  Id.  She reported being exposed to multiple bacteria and fungi in her home, and stated that she had

_____

[11]The undersigned notes that "PAC" sometimes stands for "Certified Physician's Assistant."

to move out of her home one year ago, and reported multiple-system ailments during the second exposure. <u>Id.</u> It is noted that Dr. Spearman had recommended environmental specialist evaluation. <u>Id.</u> Plaintiff described increased fatigue, extreme sensitivity to smells and certain environments, constant vertigo symptoms, and chest pain for the past three days. (Tr. 202.) She reported abdominal bloating and stomach discomfort. <u>Id.</u> She also reported joint aches. <u>Id.</u> Upon exam, plaintiff had nasal congestion. <u>Id.</u> Her heart rate was regular, and her lungs were clear to auscultation bilaterally. (Tr. 202.) Her abdomen was soft and non-tender; she had no deformities in her spine or extremities; and her hypertension was uncontrolled. (Tr. 201.) Chest x-ray revealed a few old small nodules at the right lower lobe. (Tr. 210.) Accupril[12] and HCTZ[13] were prescribed, and samples of certain asthma medication were given. (Tr. 201.) It was noted that plaintiff had an "environmental sensitivity," and recommended referral to a specialist. <u>Id.</u> Plaintiff returned on March 2, 2004 for test results unrelated to the instant Complaint. (Tr. 201.)

On April 9, 2004, plaintiff presented to the Davis Clinic, and it was noted that her weight was 279. (Tr. 203.) She

---

[12]Accupril, or Quinapril, is used to treat hypertension. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a692026.html

[13]Hctz is an abbreviation for Hydrochlorothiazide (sometimes called a "water pill"). It is used to treat high blood pressure and fluid retention caused by various conditions, including heart disease. It causes the kidneys to get rid of unneeded water and salt from the body into the urine. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682571.html

reported chest pain from a cough, and ear pain.  Id.  It was noted
that she had a history of asthma, hypertension, Meniere's disease,[14]
and environmental sensitivity, and she complained of increased
asthma symptoms, including cough with increased mucus production.
Id.  The treatment note includes the following: "[plaintiff]
repetitively describes the havoc that the mold exposure has wreaked
on her life and well-being."  Id.  Plaintiff's heart rate was
normal and her lungs were clear bilaterally, and she had no pedal
edema.  (Tr. 203.)  Her Accupril dosage was increased.  Id.

On June 21, 2004, plaintiff returned to the Davis Clinic
and reported feeling out of breath and fatigued, and also reported
breaking out in white spots on her legs and head congestion.  (Tr.
205.)  It was noted that plaintiff had environmental allergies
secondary to exposure to toxic molds.  Id.  She reported continual
body aches all over, and stated that she was unable to work because
she felt constantly tired and achy, felt a fullness in her head,
and also reported random "jumping" in her eye and arms.  Id.  She
reported that she was compliant with all of her medications.  Id.
Upon exam, there was facial hyperpigmentation, and nasal
congestion.  (Tr. 205.)  Small white spots were noted, and

---

[14]Meniere's disease can cause severe dizziness, a roaring sound in the
ears (also called tinnitus), hearing loss that comes and goes, and the feeling
of ear pressure or pain. It usually affects just one ear. It is a common cause
of hearing loss. http://www.nlm.nih.gov/medlineplus/menieresdisease.html

plaintiff was given Celebrex[15] and Flonase.[16]  Id.

Chest x-ray on June 22, 2004 revealed no change from plaintiff's prior x-ray, showing only small nodules in the right lower lobe, and was otherwise negative.  (Tr. 212.)

On August 12, 2004, plaintiff was seen by Tipu Sultan, M.D.  (Tr. 272-75.)  Plaintiff reported a history of asthma beginning in 1999 and progressing in severity.  (Tr. 272.)  She also reported a history of facial and nostril pain, severe headaches, eye pain, extreme pain in her arms and legs, extreme fatigue, dizziness, and weakness since 2001, and a history of hypertension following a pregnancy at age 33.  Id.  Plaintiff reported that, since her exposure to molds in her home, she has experienced many symptoms, including nosebleeds, tinnitus, and bladder infections.  (Tr. 274.)  Dr. Sultan's assessment was that plaintiff had some problems with bronchial asthma, which had been aggravated after being exposed to molds in her condominium, and stated that molds were an important cause for plaintiff's illness. (Tr. 273-74.)

On August 30, 2004, plaintiff was seen at St. Louis ConnectCare Community Health Center (also "ConnectCare") by Dr.

---

[15]Celebrex, or Celecoxib, is used to relieve pain, tenderness, swelling and stiffness caused by various forms of arthritis, and pain from other causes.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a699022.html

[16]Flonase, or Fluticasone, is a nasal spray used to relieve the symptoms of seasonal and perennial allergies.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a695002.html

Ravi Nayak for a consultation for asthma secondary to exposure to mold in her home. (Tr. 215-17.) She reported wheezing three to five times per day and almost every night, and stated that she could walk one-half to one block. (Tr. 216-17.) She reported that she never smoked, and also reported a deviated nasal septum from domestic abuse. (Tr. 217.) Upon exam, she was noted to be obese, and had normal breathing sounds with no wheezing. (Tr. 218.) Chest x-ray was normal. (Tr. 220.) Dr. Nayak noted that plaintiff had no history of intubation or intensive care unit admissions related to asthma. (Tr. 217.) The assessment was severe asthma and allergic rhinitis. (Tr. 218.)

On September 15, 2004, plaintiff returned to the Davis Clinic and reported environmental exposure to molds, asthma and hypertension. (Tr. 204.) It was noted that plaintiff had seen Dr. Sultan and had also seen a pulmonologist who diagnosed "severe persistent asthma." Id. It was noted that she was obese. Id. Her lungs were clear to auscultation. Id. She was given Advair[17] and Singulair.[18] (Tr. 204.)

On October 20, 2004, plaintiff returned to the Davis Clinic with complaints related to a foot/ankle sprain. (Tr. 207.)

---

[17]Advair is a combination of fluticasone and salmeterol, and is used to prevent wheezing, shortness of breath, and breathing difficulties caused by asthma and COPD.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a699063.html

[18]Singulair, or Montelukast, is used to prevent breathing difficulties and other symptoms associated with asthma and with exercise. It is also used to treat the symptoms of seasonal and perennial allergies.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a600014.html

X-ray of the bilateral ankles revealed minimal soft tissue swelling. (Tr. 213.) On December 3, 2004, plaintiff missed her appointment. Id.

On October 28, 2004, Ms. Thomas, of the Davis Clinic, wrote that it was clear that plaintiff's symptoms were consistent with chemical sensitivity caused by exposure to toxins, and that she experienced multiple complaints and ailments. (Tr. 277.) Ms. Thomas wrote that plaintiff would benefit from evaluation and treatment by an environmental specialist. Id.

Pulmonary function testing was performed at Forest Park Hospital on October 29, 2004 revealed a "moderately decreased" FVC, but normal FEVC1/FVC values. (Tr. 264-65.) Plaintiff's FEV1 readings were 1.49 pre bronchodilator, which increased to 1.55 after the administration of Prednisone. (Tr. 265.) FVC was 1.95 pre bronchodilator, and 1.90 after the administration of Prednisone. Id. Flow volume was "consistent with mild obstructive pattern," and there was no significant response to bronchodilator. (Tr. 264.)

Arterial blood gases were interpreted as normal. (Tr. 264.) Plaintiff's PaCO2 reading was 38.0, and her PaO2 was 77.9. Id.

Plaintiff was seen at ConnectCare on November 12, 2004 with complaints related to diarrhea, blood in the stool, and heartburn. (Tr. 226.) She reported having a history of asthma with occasional shortness of breath. Id. She was assessed with

irritable bowel syndrome.  Id.

Plaintiff returned to the Davis Clinic on December 8, 2004 and reported increased asthma and allergic symptoms, and complained of shortness of breath and nocturnal wheezing.  (Tr. 206.)  She also complained of tinnitus (ringing in the ears) and trouble distinguishing sounds, and also reported multiple system complaints secondary to past mold exposure. (Tr. 207.)  Plaintiff also reported difficulty with fibromyalgia, including tailbone pain and difficulty standing and sitting for long periods.  Id.  Upon exam, plaintiff's nose was "boggy" with thin, clear mucus; her heart was normal; and her lungs were clear bilaterally.  Id.  Her hypertension was stable.  Id.  She was given Accupril, HCTZ, Advair, Albuterol,[19] Zyrtec[20] and Rhinocort,[21] and given Meclizine[22] to treat Meniere's Disease. (Tr. 207.)

On December 28, 2004, plaintiff was seen by Dr. Sultan and reported problems with wheezing, difficulty breathing, and many muscle aches and pains that rendered her bedridden.  (Tr. 271.)

_____

[19]Albuterol is a bronchodilator used to prevent and treat wheezing, difficulty breathing and chest tightness caused by lung diseases such as asthma and chronic obstructive pulmonary disease (COPD; a group of diseases that affect the lungs and airways). http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a607004.html

[20]Zyrtec, or Cetirizine, is used to treat the symptoms of seasonal allergies.  http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a698026.html

[21]Rhinocort, or Budesonide, is used to treat symptoms due to allergies. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a601030.html

[22]Meclizine is used to treat nausea, vomiting, and dizziness caused by motion sickness. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682548.html

She also reported trouble hearing.  Id.

On January 14, 2005, W. Bruce Donnelly, M.D., wrote that plaintiff's pulmonary function test revealed mild obstruction, and that plaintiff's chest x-ray was normal. (Tr. 228.) Dr. Donnelly noted that plaintiff's blood pressure was 120/90, and that her diffusing capacity was normal.  Id. Dr. Donnelly also noted that plaintiff's records did not document fibromyalgia, and that plaintiff's impairment was non-severe except for environmental precautions.  Id.

On January 18, 2005, a computed tomography ("CT") scan of plaintiff's chest showed no significant findings, and a chest x-ray revealed a normal-sized heart, and clear lungs. (Tr. 231.)

On January 19, 2005, plaintiff returned to ConnectCare with complaints of bilateral hearing loss.  (Tr. 229-30.) Examination was unremarkable, and the impression was "subjective hearing loss." (Tr. 230.)

On March 16, 2005, plaintiff was seen at ConnectCare for follow-up care, with complaints of pain and stiffness with fibromyalgia, and weakness and back pain when walking. (Tr. 250.) She noted that she could not stand for more than 20 minutes.  Id. Upon exam, there was no weakness in plaintiff's upper or lower extremities, and she was tender over the lumbar spine.  Id. Her hypertension was stable.  Id.

On April 1, 2005, plaintiff was seen at the Davis clinic with complaints of sinus drainage, dizziness, and aggravation of

-15-

her asthma. (Tr. 252.) Her lungs were clear. Id. She was diagnosed with sinusitis. Id. On this date, Ms. Thomas wrote that plaintiff suffered from multiple physical and systemic ailments due to a long-standing exposure to toxic molds. (Tr. 276.) Ms. Thomas wrote: "[t]here is such a thing as chemical sensitivity which is caused by immunological damage due to toxic exposures." Id. Ms. Thomas wrote that, due to immunological and neurological effects, plaintiff was extremely sensitive to multiple environmental exposures that others would not experience. Id.

On May 20, 2005, plaintiff returned to ConnectCare and reported low back pain when walking and picking up things; leg weakness; and vertigo. (Tr. 233-34.) She reported taking HCTZ, Accupril, Advair, Albuterol, Meclizine, Prevacid,[23] Rhinocort, Naproxen,[24] and Zyrtec. Id. Plaintiff gave a history of toxic mold exposure. (Tr. 234.) Plaintiff described an achy radiation to her hips, groin and legs down to her feet, and stated that Naproxen helped for three hours. Id. It is noted that plaintiff "has 'allergies' to everything." Id. Plaintiff complained of blurred

_____

[23]Prevacid, or Lansoprazole is used to treat ulcers; gastroesophageal reflux disease (also "GERD,"a condition in which backward flow of acid from the stomach causes heartburn and esophageal injury); and conditions where the stomach produces too much acid.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a695020.html

[24]Naproxen is available in prescription and non-prescription form. It is used to relieve pain, tenderness, swelling, and stiffness caused by osteoarthritis (arthritis caused by a breakdown of the lining of the joints), rheumatoid arthritis (arthritis caused by swelling of the lining of the joints), juvenile arthritis (a form of joint disease in children), and ankylosing spondylitis (arthritis that mainly affects the spine).
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a681029.html

vision, watery eyes, a nasty taste in her mouth, nausea, shortness of breath, and weakness. Id. Plaintiff stated that, one month ago, she was unable to get out of bed in the morning because of weakness and dizziness. (Tr. 234.) Plaintiff stated that her arms became weak easily when she raised them over her head, and her feet, toes, hands, fingers, and arms became numb. Id. Plaintiff explained that her hands and fingers were numb and tingling at any time, but she had numbness and tingling in her feet and toes when lying down or sitting up. Id. Plaintiff denied urinary incontinence or retention, but complained of tingling and goose bumps all over upon feeling the need to urinate. Id. Finally, plaintiff stated that her short and long-term memory and concentration were decreased. (Tr. 234.)

Upon examination, plaintiff's memory, hearing, neck strength, and hearing were intact. (Tr. 235.) She had normal strength in her upper and lower extremities, and her fine finger movements were intact. Id. Her gait and finger-to-nose coordination were intact, and she had decreased reflexes in her toes. (Tr. 236.) She was tender to palpation of her lower back, and had pain upon twisting and bending. Id. Leg raise caused back pain. Id. It was opined that plaintiff's back pain was most likely mechanical in nature, and that there were no motor or sensory deficits attributable to the back. Id. It was recommended that plaintiff may consider physical therapy and weight loss. (Tr. 236.) The etiology of plaintiff's leg weakness was unclear, but

-17-

not likely neurologic, and it was noted that physical therapy may solve this problem.  Id.  It was opined that the numbness and tingling in plaintiff's hands was likely due to carpal tunnel, and that weight loss, and positioning the wrist to a neutral position, may help.  (Tr. 237.)

On May 24, 2005, plaintiff was seen in the Pulmonary clinic at ConnectCare.  (Tr. 240.)  Plaintiff complained of shortness of breath increased by exposure to chemical fumes, molds, anxiety, and smoking.  Id.  Plaintiff reported wheezing, and problems sleeping.  Id.  She reported a good response from Prednisone.  Id.  She was diagnosed with persistent asthma, and given Prednisone and told to continue Albuterol, Advair and Zyrtec. (Tr. 241.)

On May 26, 2005, plaintiff was seen at the Davis Clinic by Cynthia Brownfield, M.D., and was given Prednisone.  (Tr. 253.)

On June 21, 2005, plaintiff returned to ConnectCare for follow-up of asthma.  (Tr. 242.)  Plaintiff was noted to be obese, and her examination was within normal limits, with no wheezing, rales, rhonchi, or pedal edema noted. (Tr. 242-43.)  She was diagnosed with severe persistent asthma which was stable; allergic rhinitis; stable hypertension, and gastroesophageal reflux (also "GERD.")  (Tr. 243.)

On July 5, 2005, plaintiff was seen at the Davis Clinic with complaints of swelling in both feet and legs, and asthma problems.  (Tr. 254.)  Plaintiff's lungs were clear.  Id.

On July 19, 2005, plaintiff returned to ConnectCare for follow-up related to asthma, allergies, and chest pain. (Tr. 244.) It was noted that she was given Singulair, and plaintiff apparently requested a release of her medical information. (Tr. 245.) It is noted that she had no other verbal complaints. Id.

On August 4, 2005, plaintiff saw Dr. Brownfield, and it was noted that plaintiff was given Singulair, and enrolled in a patient assistance program. Id. On August 17, 2005, plaintiff complained of asthma problems and chest pain secondary to environmental exposure. (Tr. 253.) It was noted that plaintiff had recently stopped taking Prednisone. Id. It was also noted that plaintiff continued to experience increased symptoms of fibromyalgia including weakness and pain at the bottoms of her feet. Id. Upon examination, plaintiff's lungs were clear, and she walked with a stiff gait. (Tr. 255.) Her hypertension was stable. Id. She was advised to continue her asthma medications. Id.

On September 13, 2005, plaintiff returned to the Davis Clinic and complained of pain and burning in her lungs, chemical sensitivity, hoarseness after being outside, and ankle tenderness. Id. Her lungs were clear, and she was assessed with asthma and an allergic reaction, and advised to continue using inhalers. (Tr. 256.) It was also indicated that plaintiff's ankle pain may be evidence of a talofibular tear, and an MRI was recommended. Id.

On November 4, 2005, plaintiff was seen at the Davis Clinic with complaints of chest pain, ringing in her left ear, a

feeling of swelling in her head, difficulty swallowing, increased coughing and nasal congestion, and sinus pressure. (Tr. 257.) Upon examination, plaintiff's lungs were clear, and examination of her heart was normal. Id. It was opined that plaintiff's chest pain was related to her asthma, and she was given Atrovent.[25] Id. She was diagnosed with chronic sinusitis, and it was opined that plaintiff needed a steroid nasal spray. Id. She was also diagnosed with dysphagia (difficulty swallowing) and GERD, and given samples of Nexium.[26] (Tr. 257.

An MRI of plaintiff's left ankle, performed on November 10, 2005, revealed a chronic tear of the left ankle talofibular ligament; an osteochondral defect of the lateral talar dome; joint effusion; and bursitis. (Tr. 246.) MRI of the right ankle revealed mild right bursitis and joint effusion. (Tr. 247.)

On December 29, 2005, plaintiff was seen in the ConnectCare orthopedic clinic with complaints of pain in her left ankle secondary to a fall down stairs that occurred two to three years ago. (Tr. 248.)

On February 23, 2006, plaintiff returned to the Davis Clinic for asthma follow-up. (Tr. 258.) She complained of facial pain with skin darkening, and increased allergy symptoms. Id. Her

---

[25]Atrovent, or ipratropium oral inhalation, is a bronchodilator used to prevent wheezing, difficulty breathing, chest tightness, and coughing in people with chronic obstructive pulmonary disease (COPD; a group of diseases that affect the lungs and airways) such as chronic bronchitis (swelling of the air passages that lead to the lungs) and emphysema (damage to the air sacs in the lungs). http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a695021.html

[26]Nexium, or Esomeprazole, is used to treat GERD, a condition in which backward flow of acid from the stomach causes heartburn and injury of the esophagus. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a699054.html

lungs were clear.  Id.  She was advised to take Nasonex, and Protonix[27] for dysphagia.  (Tr. 259.)  Plaintiff was seen again on March 22, 2006 with complaints of pain and swelling in her left arm, and asthma exacerbation secondary to gas exposure.  (Tr. 260.)  Her lungs were clear.  Id.

On June 16, 2006, plaintiff presented to the Davis Clinic for follow-up of her asthma, which was noted as severe and persistent.  (Tr. 267-68.)  She complained of leg and ankle pain, and worsening symptoms of vertigo with seasonal and environmental changes.  (Tr. 268.)  She also complained of persistent fibromyalgia tender points.  Id.  Upon examination, there were no nodes or masses in her neck; her heart was normal; and her lungs were clear.  Id.  It was noted that her hypertension was stable.  Id.

On July 3, 2006, plaintiff presented to ConnectCare and her history of Meniere's Disease was noted.  (Tr. 262.)  She reported having vertigo, and was noted to be obese.  Id.  She was diagnosed with Meniere's Disease and dysphagia.  Id.  On July 14, 2006, she presented for thyroid testing results, which indicated an enlarged thyroid with multiple nodules.  (Tr. 261, 263.)

On August 16, 2006, plaintiff presented to the Davis

_____

[27]Protonix, or Pantoprazole, is used to treat gastroesophageal reflux disease (GERD), a condition in which backward flow of acid from the stomach causes heartburn and injury of the esophagus. It is also used to treat conditions where the stomach produces too much acid. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601246.html

Clinic with complaints related to asthma and allergies. (Tr. 266.)

In correspondence dated February 12, 2007, Dr. Sultan wrote that plaintiff experienced a worsening of her asthma symptoms following the onset of mold infestation at her home, subsequent to a leaky roof. (Tr. 296.) Dr. Sultan also wrote that plaintiff developed facial and nostril pain, severe headaches, eye pain, extreme pain in her legs and arms, extreme fatigue, dizziness, weakness, and fainting spells. Id. Dr. Sultan noted that plaintiff's asthma continued to worsen, and environmental studies were done which showed a massive mold infestation at plaintiff's house, and plaintiff subsequently moved to a different house, but noticed no significant improvement. (Tr. 296-97.) Dr. Sultan noted that plaintiff complained of being bothered by chemical odors, and provided a long list of substances that bothered plaintiff. (Tr. 297.)

Dr. Sultan opined that, within a reasonable degree of medical certainty, plaintiff's condition as he described it was "more probably true than not true," and was proximately caused by exposure to excessive amounts of various molds. Id. Dr. Sultan wrote that plaintiff's history of exposure to multiple kinds of molds over an extended period of time resulted in mold toxicity that led to mold sensitivity and injury to and dysfunction of multiple organs and systems. (Tr. 299.) Dr. Sultan indicated that plaintiff's pulmonary system was damaged, as manifested by her asthma; her nervous system was damaged, causing headaches, marked

-22-

reduction in memory and concentration, and difficulty thinking clearly and making decisions; and her musculoskeletal system was damaged, which was manifested as arthralgia in the form of joint pain, severe muscle cramping, spasm and tightness in the upper back, and myalgia. Id. Dr. Sultan also indicated that the damage to plaintiff's body included chemical sensitivity, and food allergies. Id.

Dr. Sultan opined that plaintiff would not be able to return to her old job, and that the chances of her recovery were none, even over a long period of time. (Tr. 298.) Dr. Sultan opined that plaintiff was permanently and totally disabled, and would not be able to recover in any foreseeable future. Id. Dr. Sultan wrote that plaintiff would be "unable to return to any gainful employment, ever." Id.

On July 24, 2007, plaintiff was evaluated by James M. England, Jr., a vocational rehabilitation counselor. (Tr. 285-95; 300-310).[28] Mr. England indicated that plaintiff was a "tremendously obese woman" who moved with some difficulty, and seemed to be out of breath with virtually any exertion, such as crossing the room. (Tr. 285.) Mr. England noted that plaintiff shifted around while seated "to help with her back pain," listened attentively during the discussion of vocational rehabilitation, and

_____

[28]Mr. England's report appears twice in the Administrative Record. For purposes of simplicity, the undersigned will hereafter reference only the first occurrence.

responded in a forthright manner. _Id._

Mr. England noted that plaintiff developed hypertension at age 33, and asthma in 1991. _Id._ Mr. England reviewed medical information detailing plaintiff's treatment for asthma, and all of her attendant symptoms. (Tr. 285-92.) Mr. England noted that changes in weather, particularly cold and humid conditions, exacerbated plaintiff's problems. (Tr. 292.) He noted that plaintiff took a "tremendous variety of medications to help with her problems." _Id._ He indicated that plaintiff's primary difficulty was breathing, and that plaintiff was short of breath nearly all of the time, and also had some chest pain. _Id._ Mr. England noted that plaintiff had muscle aching in her shoulders, neck, elbows, knees and back down to her tailbone related to fibromyalgia. _Id._ He noted that plaintiff reported that her thighs tingled three to four times per week. (Tr. 292.) He noted that plaintiff had difficulty reaching overhead, but no trouble seeing, talking, or hearing. _Id._ Mr. England noted that plaintiff could stand only about 15 to 20 minutes; could walk only a short block before becoming winded; could not bend over very well; and avoided kneeling. _Id._ A gallon of liquid is the heaviest thing she carried. _Id._ Mr. England noted that plaintiff could sit 15 to 20 minutes before beginning to stiffen up, and became short of breath after just a few steps. (Tr. 292.) He noted that plaintiff's "balance seems off at times and she has to be careful when trying to squat or she will fall." _Id._ Mr. England indicated

that plaintiff drove some, but generally only about twice per week. Id. He noted that plaintiff still tries to walk, but that she no longer dances or fishes, and had to give up knitting due to trouble with her hands. (Tr. 293.) Mr. England wrote that plaintiff was an avid reader, and that she attended church with her family. Id.

Mr. England noted that plaintiff was a high-school graduate; completed 12 hours of community college; and completed an eighteen-month course at AIMed Academy and became a registered medical assistant. Id. He noted plaintiff's past work for United Healthcare, Women's Health Partners, a physician, and Barnes, and that plaintiff had to leave all of these jobs due to difficulties with asthma and allergies to things in those environments. Id. Mr. England also noted plaintiff's past work for OB-Gyn Specialists as a registered medical assistant. (Tr. 294.) Mr. England concluded that, "[a]bsent the degree of her impairments she would have transferable skill down to a sedentary level of exertion." Id.

Mr. England noted that he had administered the Wide-Range Achievement Test, Revision 3, and that plaintiff scored at a post-high-school level on reading, but at only the 7th grade level in arithmetic, and that these scores would be adequate for a variety of entry-level service employment. Id. Mr. England noted that plaintiff reported being awakened three to four times per night by shortness of breath and pain, and slept no more than three to four hours per night as a result. Id. He noted that plaintiff reported

-25-

falling asleep due to fatigue, and having to use her nebulizer three to four times per day, which caused her to feel jittery. (Tr. 294.) Plaintiff indicated that she was unable to vacuum or use her gas stove, and spent half of her day reclining to help with pain. Id.

Mr. England concluded that, considering plaintiff's presentation and her combination of medical problems, he did not believe that plaintiff could successfully compete for employment, or sustain it in the long run. (Tr. 295.) He noted that plaintiff continued to attempt to work in her chosen field at the sedentary level until she reached the point where she could not handle it on a day-to-day basis. Id. Mr. England wrote that he did not believe that there was any type of work less physically demanding than where plaintiff was last employed. Id. Mr. England wrote that, considering the combination of plaintiff's functional difficulties, he believed that plaintiff was likely to remain totally disabled, and that he saw no indication in the medical records that further treatment was likely to improve her functioning. Id.

B.    Plaintiff's Testimony

During the administrative hearing on September 26, 2006, plaintiff testified that she had a high-school diploma and two years of college, and was a registered medical assistant. (Tr. 314-15.) Plaintiff indicated that she did not finish course work in medical billing due to illness. (Tr. 315.) Plaintiff stated

that she had previously worked for the Coast Guard, United Healthcare, OB-Gyn Specialists, Barnes Hospital, and Women's Health Partners as a registered medical assistant.  Id.  Plaintiff testified that she applied for unemployment benefits in 2001.  (Tr. 316.)  Plaintiff testified that she had never been in prison or jail, and had never undergone alcohol or drug rehabilitation.  Id. Plaintiff testified that her current weight was 320 pounds, and that taking Prednisone had caused her to gain weight.  (Tr. 345.)

Plaintiff testified that Andrea Thomas referred her to an environmental specialist, Dr. Sultan, who diagnosed her in 2004 with chemical sensitivity.  (Tr. 317-19.)  Plaintiff testified that she used a nebulizer four times per day.  (Tr. 319.)  Plaintiff testified that she had filed a previous application for benefits, but was re-filing because of the new diagnosis offered by Dr. Sultan.  (Tr. 321.)  Plaintiff testified that she also saw a gastrologist at ConnectCare.  (Tr. 322-23.)  The ALJ noted that the Davis Clinic notes appeared to be authored by a physician's assistant, and plaintiff testified that she saw Andrea Thomas there, but a physician, Dr. Brownfield, would also come in with Ms. Thomas and participate in the work-up.  (Tr. 324-25.)  Plaintiff testified that she saw Dr. Brownfield almost every time she went to the Davis Clinic, and that Dr. Brownfield had been her doctor since 2004.  (Tr. 326.)

Plaintiff testified that she was unable to do her past work because exposure to many different kinds of chemical smells,

including cologne, outdoor car exhaust and markers, would cause her to have an asthmatic reaction. (Tr. 329-30.) Plaintiff testified that she would sometimes react in this way to the patients. Id. Plaintiff testified that she often missed time from work because her asthma was so severe that it left her exhausted, and she would experience rashes and inflammation in her nose. (Tr. 330.) Plaintiff testified that the only problem that kept her from working was her asthma, but that her asthma was triggered by many things, including Meniere's Disease, severe rhinitis, gastritis, and GERD. (Tr. 331.) Plaintiff testified that she was compliant with all of her medications, but that some of her conditions caused her asthma medication to be less effective. Id. Plaintiff testified that she did not stay out of her home for long because she needed to be near her nebulizer machine. (Tr. 332.) Plaintiff testified that she had attacks four to five times per night. (Tr. 332-33.) Plaintiff testified that Prednisone helped her with the inflammation in her lungs, but that her doctors did not want to keep her on Prednisone because it aggravated other organs in the body, including the kidneys. (Tr. 333.) Plaintiff testified that she was once on Prednisone for eight months out of a year. Id.

Plaintiff testified that she was not alleging a mental impairment. Id. Plaintiff testified that, during the day, she had six or seven asthma attacks. (Tr. 334.) Upon hearing this testimony, the ALJ stated "And yet none of that's in your medical records." Id. Plaintiff responded that she told her doctors, but

that they merely wrote that her asthma was severe and persistent, and plaintiff's counsel noted plaintiff's June 16, 2006 visit, in which it is noted that her asthma was severe and persistent. (Tr. 335.) Plaintiff testified that, during her asthma attacks, she became very weak and short of breath, and had tightness in her chest. Id. Plaintiff testified that she has heart palpitations, and usually had to go to bed. (Tr. 336-37.) She testified that her stomach started hurting because it aggravated her gastritis. (Tr. 337.) Plaintiff testified that she struggled for breath for five to ten minutes, and that she was at times in bed for three to four days. Id. Plaintiff testified that, when she had attacks while working, she would be sent home. (Tr. 337-38.)

Plaintiff testified that she rose at 7:00 a.m. and stretched her legs because she had problems with her ankles. (Tr. 338.) She testified that she then took her medication and used her nebulizer machine, and that her adult daughter prepared her breakfast. Id. Plaintiff testified that she then tried to clean up the house, but had exacerbations "back and forth all through the day," and sometimes had to return to bed. (Tr. 339.) Plaintiff testified that she tried to cook dinner twice per week, but was allergic to the gas stove. (Tr. 340.) Plaintiff testified that she could not vacuum, but she could sweep, and she cleaned her bathroom and washed dishes every day. (Tr. 340-41.) Plaintiff testified that, two to three times per week, she drove herself to church services. (Tr. 341.) Plaintiff then testified that she

often missed meetings due to illness.  (Tr. 342-43.)

Plaintiff testified that her daughter and niece did her grocery shopping for her because she was unable to stand for a long while due to her ankles.  (Tr. 343.)  Plaintiff testified that she could stand no more than 15 to 20 minutes, and could walk a block. (Tr. 342-43.)  Plaintiff testified that she wore an ankle brace, and required a cane.  (Tr. 343.)  Plaintiff testified that she could lift 10 to 12 pounds and could sometimes sit for an hour, but at other times she had to lay flat because of back pain she attributed to fibromyalgia.  (Tr. 346.)

Plaintiff testified that she could not go out to the movies with her family because she might have a reaction to other people's colognes, and did not want to be away from her nebulizer machine.  Id.  Plaintiff testified that she loved to read and watch videos, and liked to sit on the deck at her apartment.  (Tr. 347.) She testified that she sometimes visited her foster mother, but could not stay in her house long because she had a dog.  Id.


### III. The Commissioner's Final Decision

As discussed above, the Appeals Council's August 14, 2008 decision is the final decision of the Commissioner.  Therein, the Appeals Council adopted the ALJ's findings at steps one through three, and also adopted the ALJ's conclusion that plaintiff had the residual functional capacity for sedentary work activity, with the need to avoid concentrated exposure to fumes, odors, dusts, gases

and poor ventilation, and the ALJ's overall determination that plaintiff was "not disabled." The undersigned will therefore address herein the ALJ's findings at steps one through three.

The ALJ in this case determined that plaintiff's instant request for a hearing involved the same parties, facts and issues as were adjudicated in the Administration's May 25, 2004 decision, and that plaintiff's request was dismissed for res judicata insofar as it pertained to entitlement to benefits prior to May 26, 2004.[29] (Tr. 18.) The ALJ determined that, while only the period since May 26, 2004 was at issue, evidence prior to May 25, 2004 was considered in order to fully understand plaintiff's condition. Id.

The ALJ determined that plaintiff met the insured status requirements through September 30, 2008. (Tr. 20.) She determined that plaintiff had not engaged in substantial gainful activity since August 26, 2002. Id. The ALJ noted that, during plaintiff's September 26, 2006 hearing, she testified that the only impairment that prevented work was asthma and chemical sensitivity. (Tr. 21.) The ALJ determined that plaintiff had the severe impairments of asthma and obesity, but that she did not have an impairment or combination of impairments of listing-level severity. Id. In so finding, the ALJ noted that a Pulmonary Function Report dated October 29, 2004 failed to meet Listing 3.03, and further noted that the medical record did not substantiate the requirements of

---

[29]On appeal, plaintiff alleges no error in limiting the period covered by her current application, and including medical evidence predating the indicated period for background purposes only.

attacks in spite of prescribed treatment requiring physician intervention, occurring at least once every two months or six times a year, during a twelve consecutive month evaluation period.  Id. The ALJ determined that plaintiff had the residual functional capacity to lift up to ten pounds, sit six hours of an eight-hour workday, and walk and stand no more than two hours of an eight-hour workday.  Id.  The ALJ also found that plaintiff should avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation, and so forth.  (Tr. 21.)  The ALJ noted that, while plaintiff had asthma and obesity, those conditions were not so severe to rule out the "modest exertional demands of sedentary work."  Id.

        The ALJ noted her duty to evaluate plaintiff's subjective complaints in accordance with 20 C.F.R. 404.1529 and Social Security Rulings (also "SSR") 96-4p and 96-7p, and indicated that she had considered opinion evidence in accordance with 20 C.F.R. 404.1527 and 416.927, and SSRs 96-2p, 96-5p, and 96-6p.  Id.  The ALJ considered the evidence of record and determined that, while plaintiff's medically determinable impairments could be expected to produce some of the alleged symptoms, plaintiff's statements concerning the intensity, persistence, and limiting effects of those symptoms were not entirely credible.  Id.  The ALJ noted that, although plaintiff had been diagnosed with obesity, there was no persuasive evidence that it was accompanied by significant degenerative joint disease, degenerative disc disease, reduced

-32-

respiratory capacity, or any other such condition, or that a physician had opined that it resulted in severe symptoms and limitations of function for twelve consecutive months. (Tr. 25.)

As noted above, while the ALJ found that plaintiff could not return to her past relevant work, inasmuch as it involved lifting more than ten pounds, the Appeals Council did not adopt this finding, and instead found that plaintiff could return to her past relevant work as a medical secretary. In so finding, the Appeals Council noted that, although plaintiff "indicated that she did the particular job of medical secretary at the light exertional level, the functional job duties, as ordinarily required by employers throughout the national economy, are performed at the sedentary exertional level (in accordance with the Dictionary of Occupational Titles Number 201.362-014.)" (Tr. 9.)

The Appeals Council noted that it considered new evidence from Dr. Sultan dated February 12, 2007, and from Mr. England dated July 24, 2007, and indicated that it was not persuaded that the additional comments or evidence would warrant any change in the finding that plaintiff was able to perform her past relevant work as a medical secretary, as that job is performed in the national economy. Id.

## IV. Discussion

This Court has jurisdiction to review the Appeals Council's decision, inasmuch as it is that decision that is the

Commissioner's "final decision." Sims, 530 U.S. at 106-107 (if the Appeals Council grants review of a claim, then the decision that the Council issues is the Commissioner's final decision); see also Browning, 958 F.2d at 822 (statutory jurisdiction is confined to review of the Commissioner's final decision). As noted above, plaintiff herein challenges only the ALJ's decision. However, because the Appeals Council adopted the ALJ's findings at steps one through three, the undersigned can address plaintiff's arguments that are directed at those findings, inasmuch as those findings were made part of the Commissioner's final decision. See Mitchell v. Shalala, 48 F.3d 1039, 1040 (8th Cir. 2005) ("The Appeals Council adopted the ALJ's ruling in June of 1992, making it the Secretary's final decision.")

To be eligible for benefits under the Social Security Act, a plaintiff must prove that she is disabled. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001); Baker v. Secretary of Health & Human Services, 955 F.2d 552, 555 (8th Cir. 1992). The Social Security Act defines "disability" in terms of the effect a physical or mental impairment has on a person's ability to function in the workplace. See 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). Specifically, a "disability" under the Act is an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."

-34-

Id.  The Act further specifies that a person must be both unable to do his previous work and unable, "considering his age, education, and work experience, [to] engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work."  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); see also Bowen v. Yuckert, 482 U.S. 137, 140 (1987); Heckler v. Campbell, 461 U.S. 458, 459-460 (1983).

To determine whether a claimant is disabled, the Commissioner utilizes a five-step evaluation process.  See 20 C.F.R. §§ 404.1520, 416.920; Bowen, 482 U.S. at 140-42.  The Commissioner begins by considering the claimant's work activity. If the claimant is engaged in substantial gainful activity, disability benefits are denied.  Next, the Commissioner decides whether the claimant has a "severe impairment," meaning one which significantly limits his ability to do basic work activities.  If the claimant's impairment is not severe, then he is not disabled. If the claimant's impairment is severe, the Commissioner then determines whether it meets or is equal to one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1.  If claimant's impairment is equivalent to one of the listed impairments, he is conclusively disabled.  At the fourth step, the Commissioner establishes whether the claimant has the residual functional capacity to perform his or her past relevant work.  If so, the

claimant is not disabled. If not, the burden then shifts to the Commissioner to prove that there are other jobs that exist in substantial numbers in the national economy that the claimant can perform. <u>Pearsall</u>, 274 F.3d at 1217, <u>Nevland v. Apfel</u>, 204 F.3d 853, 857 (8th Cir. 2000). Absent such proof, the claimant is declared disabled and becomes entitled to disability benefits.

The Commissioner's findings are conclusive upon this Court if they are supported by substantial evidence. 42 U.S.C. § 405(g); <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971); <u>Young o/b/o Trice v. Shalala</u>, 52 F.3d 200 (8th Cir. 1995), <u>citing</u> <u>Woolf v. Shalala</u>, 3 F.3d 1210, 1213 (8th Cir. 1993). Substantial evidence is less than a preponderance, but enough that a reasonable person would find adequate to support the conclusion. <u>Briggs v. Callahan</u>, 139 F.3d 606, 608 (8th Cir. 1998). To determine whether the Commissioner's decision is supported by substantial evidence, the Court must review the entire administrative record and consider:

1.    The credibility findings made by the ALJ;

2.    The plaintiff's vocational factors;

3.    The medical evidence from treating and consulting physicians;

4.    The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments;

5.    Any corroboration by third parties of the plaintiff's impairments;

6. The testimony of vocational experts, when required, which is based upon a proper hypothetical question which sets forth the plaintiff's impairment.

Stewart v. Secretary of Health & Human Services, 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

The Court must also consider any "evidence which fairly detracts from the ALJ's findings." Groeper v. Sullivan, 932 F.2d 1234, 1237 (8th Cir. 1991); see also Briggs, 139 F.3d at 608. However, where substantial evidence supports the Commissioner's decision, the decision may not be reversed merely because substantial evidence also supports a different outcome. Jones ex rel. Morris v. Barnhart, 315 F.3d 974, 977 (8th Cir. 2003) (citing Davis v. Apfel, 239 F.3d 962, 966 (8th Cir. 2001)).

To be eligible for disability insurance benefits under Title II, a claimant must meet the statute's insurance requirements. Davidson v. Astrue, 501 F.3d 987, 990-91 (8th Cir. 2007) (citing Long v. Chater, 108 F.3d 185, 187 (8th Cir. 1997)); 42 U.S.C. § 416(i)(2)(C), 416(i)(3)(B). "When an individual is no longer insured for Title II disability purposes, we will only consider [her] medical condition as of the date she was last insured." Id. To be eligible for Supplemental Security Income benefits under Title XVI, plaintiff must establish that she was disabled while her application was pending. See 42 U.S.C. § 1382c, 20 C.F.R. §§ 416.330 and 416.335 (2002).

In the case at bar, plaintiff argues that the ALJ's decision fails to articulate a legally sufficient rationale for its findings of residual functional capacity. Plaintiff argues that the ALJ failed to properly consider all of plaintiff's medically determinable impairments, and "failed to point to the medical evidence to support its contention plaintiff was capable of engaging in a limited range of sedentary work." (Docket No. 18 at 14-22.) Specifically, plaintiff argues that the decision failed to articulate a legally sufficient rationale for not including the medically determinable impairments of Meniere's Disease, vertigo, dizziness, and back pain, inasmuch as such were documented in the medical evidence. Plaintiff also contends that Dr. Sultan's February 2007 report reveals that plaintiff's condition is too severe to merely limit concentrated exposure to environmental irritants. Plaintiff also notes authority indicating the ALJ's duty to fully and fairly develop the record, re-contact physicians when necessary, and the weight to be given to treating sources, but does not indicate which treating sources the ALJ should have re-contacted, or which medical evidence was improperly weighed.[30]

In response, the Commissioner noted that, while the decision of the Appeals Council is the final decision of the

---

[30]As indicated above, plaintiff also challenges the ALJ's reliance upon the Guidelines to direct a finding of "not disabled" at step five. However, inasmuch as the Appeals Council did not adopt these findings of the ALJ, and issued a decision terminating the sequential evaluation process at step four, the ALJ's step five decision is not the "final decision" of the Commissioner, and is therefore not subject to review by this Court.

Commissioner, the Commissioner would refer to the ALJ's decision in that section of his argument because the Appeals Council adopted the ALJ's RFC assessment and his statements regarding the issues and evidentiary facts of the case. (Defendant's Brief, Docket No. 21 at 12, n. 9.) Defendant continues, and argues that the ALJ's findings regarding plaintiff's RFC, which were adopted by the Appeals Council, were supported by substantial evidence on the record as a whole. (Id. at 12-15.)

Residual functional capacity is defined as that which a person remains able to do despite her limitations. 20 C.F.R. § 404.1545(a), Lauer v. Apfel, 245 F.3d 700, 703 (8th Cir. 2001). The ALJ must assess a claimant's RFC based upon all relevant, credible evidence in the record, including medical records, the observations of treating physicians and others, and the claimant's own description of his symptoms and limitations. 20 C.F.R. §§ 404.1545(a); Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995); Goff v. Barnhart, 421 F.3d 785, 793 (8th Cir. 2005).

A claimant's RFC is a medical question, and there must be some medical evidence, along with other relevant, credible evidence in the record, to support the ALJ's RFC determination. Id.; Hutsell v. Massanari, 259 F.3d 707, 711-12 (8th Cir. 2001); Lauer, 245 F.3d at 703-04; McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000). An ALJ's RFC assessment which is not properly informed and supported by some medical evidence in the record cannot stand. Hutsell, 259 F.3d at 712. However, although an ALJ must determine

the claimant's RFC based upon all relevant evidence, the ALJ is not required to produce evidence and affirmatively prove that a claimant can lift a certain weight or walk a certain distance. Pearsall, 274 F.3d at 1217 (8th Cir. 2001); McKinney, 228 F.3d at 863. The claimant bears the burden of establishing his RFC. Goff, 421 F.3d at 790.

Before determining the claimant's residual functional capacity, the ALJ must evaluate the credibility of the claimant's subjective complaints. Wagner v. Astrue, 499 F.3d 842, 851 (8th Cir. 2007) (citing Pearsall, 274 F.3d at 1217.) Testimony regarding pain is necessarily subjective in nature, as it is the claimant's own perception of the effects of his alleged physical impairment. Halpin v. Shalala, 999 F.2d 342, 346 (8th Cir. 1993). Because of the subjective nature of physical symptoms, and the absence of any reliable technique for their measurement, it is difficult to prove, disprove or quantify their existence and/or overall effect. Polaski at 1321-22. In Polaski, the Eighth Circuit addressed this difficulty and established the following standard for the evaluation of subjective complaints:

> The absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints. The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as: (1)

the claimant's daily activities; (2) the
duration, frequency and intensity of the pain;
(3) precipitating and aggravating factors; (4)
dosage, effectiveness and side effects of
medication; (5) functional restrictions.

Id. at 1322.

Although the ALJ is not free to accept or reject the
claimant's subjective complaints based upon personal observations
alone, he or she may discount such complaints if there are
inconsistencies in the evidence as a whole. Id. The "crucial
question" is not whether the claimant experiences symptoms, but
whether his credible subjective complaints prevent him from
working. Gregg v. Barnhart, 354 F.3d 710, 713-14 (8th Cir. 2003).
When an ALJ explicitly considers the Polaski factors and discredits
a claimant's complaints for a good reason, that decision should be
upheld. Hogan v. Apfel, 239 F.3d 958, 962 (8th Cir. 2001); see
also Tucker v. Barnhart, 363 F.3d 781, 783 (8th Cir. 2004) ("The
ALJ is not required to discuss each Polaski factor as long as the
analytical framework is recognized and considered."). The
credibility of a claimant's subjective testimony is primarily for
the ALJ, not the courts, to decide, and the court considers with
deference the ALJ's decision on the subject. Tellez v. Barnhart,
403 F.3d 953, 957 (8th Cir. 2005).[31]

_____

[31]Although plaintiff herein does not challenge the ALJ's credibility
determination, she does challenge the ALJ's RFC determination. Because the
ALJ must first evaluate a claimant's credibility before determining her RFC,
Tellez v. Barnhart, 403 F.3d 953, 957 (8th Cir. 2005), the undersigned
conducted a full analysis of the ALJ's credibility determination. In
                                                              (continued...)

Plaintiff first argues that the ALJ erred by failing to include Meniere's Disease, vertigo and dizziness in the RFC determination. Review of the decision reveals no error. Contrary to plaintiff's contention, the ALJ explicitly considered plaintiff's vertigo and dizziness in assessing her RFC. While the ALJ did not specifically refer to Meniere's Disease by name, she did refer to vertigo, dizziness, and alleged hearing loss, symptoms of that condition, as noted in the medical records, and she considered those conditions in her RFC assessment. As the Commissioner notes, the ALJ found that nothing in the relevant medical records indicated that any of those conditions imposed any specific functional limitations on plaintiff greater than those in the ALJ's RFC assessment. The ALJ noted that, on January 19, 2005, plaintiff was seen at ConnectCare with complaints of bilateral hearing loss, but examination was unremarkable, and the impression was merely subjective hearing loss. The ALJ also noted that, during the administrative hearing, plaintiff "was able to respond unhesitatingly to questions in a logical manner and did not display outward signs one would associate with an individual suffering a

---

[31](...continued)
assessing plaintiff's credibility, the ALJ acknowledged his duty to consider all of the evidence of record relevant to plaintiff's complaints, cited Regulations and Social Security Rulings corresponding with the Eighth Circuit decision in Polaski v. Heckler, 739 F.2d 1320, 1321-22 (8th Cir. 1984), listed the relevant factors, and set forth numerous inconsistencies in the record detracting from plaintiff's credibility. Where adequately explained and supported, credibility findings are for the ALJ to make. See Tang v. Apfel, 205 F.3d 1084, 1087 (8th Cir. 2000). The undersigned has carefully reviewed the record, and believes that the ALJ's finding that plaintiff's subjective complaints were not fully credible was adequately explained, and was supported by substantial evidence on the record as a whole.

hearing loss." (Tr. 23.) While an ALJ's observations cannot be the sole basis of her decision, she does not err when she includes her observations as one of several factors. Lamp v. Astrue, 531 F.3d 629, 632 (8th Cir. 2008). In this case, the ALJ combined her review of the record as a whole with her personal observations, an action not precluded by Eighth Circuit precedent. See Id.

In addition, the undersigned notes that plaintiff reported driving an average of two to three times per week. No physician opined that plaintiff should refrain from driving due to Meniere's Disease or any of the attendant symptoms such as dizziness, vertigo, or hearing loss. It would seem that, if Meniere's Disease and the attendant symptoms were as limiting as plaintiff alleges, her physicians would have restricted her driving in the interests of public safety and plaintiff's own personal safety, or that plaintiff herself would refrain from driving for those same reasons. However, no physician expressed any specific functional limitations resulting Meniere's disease or its attendant symptoms. Hensley v. Barnhart, 352 F.3d 353, 357 (8th Cir. 2003) (the absence of functional restrictions placed on claimant's activities was inconsistent with a claim of disability); see also Brown v. Chater, 87 F.3d 963, 964-65 (8th Cir. 1996) (lack of significant restrictions imposed by treating physicians supported ALJ's decision that claimant was not disabled.) The fact that the ALJ did not specifically write "Meniere's Disease" in her opinion, and instead considered the individual symptoms associated with that

condition, does not support plaintiff's argument that the ALJ disregarded the aspects of the record related to Meniere's Disease. See <u>Wheeler v. Apfel</u>, 224 F.3d 891, 896 (8th Cir. 2000) (citing <u>Black v. Apfel</u>, 143 F.3d 383, 386 (8th Cir. 1998) (although an ALJ is required to ensure a fully and fairly developed record, an ALJ is not required to discuss every piece of evidence submitted, and failure to cite specific evidence does not necessarily mean that it was not considered.)

Plaintiff also contends that the ALJ improperly determined that plaintiff had not had back pain for the requisite amount of time, rendering her RFC determination inadequate. The undersigned disagrees.

As noted above, the Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 416(I)(1)(a); 42 U.S.C. § 423(d)(1)(a). The claimant has the burden of proving that s/he has a disabling impairment. See <u>Ingram v. Chater</u>, 107 F.3d 598, 601 (8th Cir. 1997). As previously discussed, <u>res</u> <u>judicata</u> applies to the period prior to May 26, 2004. As such, plaintiff must show that her back condition was disabling during the period from that date forward.

In the case at bar, the ALJ noted plaintiff's May 20, 2005, visit to ConnectCare for a neurological evaluation for lower

back pain.  The ALJ noted that plaintiff was assessed with back pain, but that there were no motor or sensory deficits found to be attributable to plaintiff's back.  The ALJ also noted that the etiology of plaintiff's leg weakness was determined to be unclear and not neurologic in nature, and that plaintiff was advised to follow up with her primary care physician.[32]  The ALJ also noted that there was no evidence of a dermatomal pattern of radiculopathy; no evidence of severe persistent muscle spasms or muscle atrophy due to disuse; and no evidence of any significant loss of range of motion or loss of motor strength.  Citing 20 C.F.R. §§ 404.1529(c)(2) and 416.929(c)(2), the ALJ noted that reduced joint motion, muscle spasm, sensory deficit and motor disruption were useful indicators to assist in drawing conclusions about the intensity and persistence of symptoms, and the effect such symptoms may have on the ability to perform work.  (Tr. 23.)  Having reviewed the evidence of record, the ALJ determined that there was no evidence that plaintiff's back pain met the durational requirements of the Regulations, inasmuch as there was no evidence that it had lasted, or could be expected to last, 12 continuous months.  Id.

In her brief, plaintiff cites various treatment notes related to joint aches, muscle aches and pains, and fibromyalgia, some of which predate the relevant time period.  These records do

_____

[32]In addition, the undersigned notes that plaintiff reported that her weakness was not associated with back pain.  (Tr. 234.)

not establish that plaintiff's back pain lasted or could be expected to last a continuous 12 months, as the Regulations require. As the ALJ determined, the contemporaneous medical evidence simply does not establish that plaintiff's back pain lasted or could be expected to last the requisite amount of time. While plaintiff did complain of back pain in May of 2005, physical examination was largely negative; plaintiff had normal physical examinations on many occasions; and the record documents several instances of subsequent medical visits during which plaintiff did not complain of back pain. Furthermore, as the Commissioner notes, even if the medical evidence did establish a back condition of the requisite duration, the treatment notes do not indicate that plaintiff's back pain imposed any functional limitations greater than those in the ALJ's RFC determination. See Stephens v. Shalala, 46 F.3d 37, 38 (8th Cir. 1995) (per curiam) (ALJ properly discredited allegations of back pain when no complaints were made about such pain while receiving other treatment.)

Plaintiff next contends that the ALJ's RFC determination contained an insufficient restriction concerning plaintiff's environmental limitations, and that she should have precluded "moderate" exposure rather than "concentrated" exposure to irritants. In support, plaintiff directs the Court's attention to Dr. Sultan's February 2007 report, which plaintiff argues showed significant problems relative to severe asthma with wheezing, difficulty breathing, chest tightness, shortness of breath, and

other symptoms.  Plaintiff argues that the "severity of Plaintiff's
etiology leads reasonably to the conclusion merely concentrated
exposure is not a sufficient restriction.  It appears that even
moderate exposure triggers these events based on the medical
evidence of record.  Thus, the conclusions reached regarding
residual functional capacity and environmental limitations are not
supported by medical evidence as required." (Plaintiff's Brief at
20.)  Plaintiff concludes that the ALJ's decision failed to
properly consider all of the medically determinable impairments;
failed to adequately consider development of the record; and failed
to point to medical evidence supporting the conclusion that
plaintiff was able to engage in sedentary work activity day in and
day out.[33]

As indicated above, the evidence upon which plaintiff
relies to support her argument, Dr. Sultan's February 12, 2007,
report, was not part of the administrative record before the ALJ,
but was reviewed and considered by the Appeals Council.  When the
Appeals Council considers new evidence, this Court must decide
whether the ALJ's decision is supported by substantial evidence on
the record as a whole, which now includes the new evidence.
Gartman v. Apfel, 220 F.3d 918, 922 (8th Cir. 2000) (citing Kitts

---

[33]Plaintiff also cites this Court to precedent concerning an ALJ's duty
to ensure a fully and fairly developed record, and to recontact physicians
when necessary.  Plaintiff does not, however, explain how the ALJ failed to
fully and fairly develop the record, identify which physicians she should have
recontacted, or how any such evidence would have affected the ALJ's decision.
See (Plaintiff's Brief at 21-22.)

v. Apfel, 204 F.3d 785, 786 (8th Cir. 2000)); see also Richmond v.
Shalala, 23 F.3d 1441, 1444 (8th Cir. 1994) (Court must review
evidence considered by Appeals Council and determine "whether there
is substantial evidence in the administrative record, which now
includes the new evidence, to support the ALJ's decision.")

In the case at bar, considering Dr. Sultan's February
2007 report as part of the administrative record, the undersigned
determines that substantial evidence supports the ALJ's decision.
As the Appeals Council found the new evidence provides no basis for
changing the ALJ's decision.  In determining that plaintiff should
avoid "concentrated" exposure to environmental pollutants, the ALJ
noted plaintiff's plaintiff's October 29, 2004, pulmonary function
report which, as discussed above, was largely normal, revealing
only mild limitation.  Other contemporaneous medical records
document that, upon examination, plaintiff's lungs were repeatedly
clear, (Tr. 204, 233, 257), and chest x-rays revealed that
plaintiff's lungs were clear.  (Tr. 212, 232.)  In August of 2004,
Dr. Nayak noted that plaintiff had no history of intubation or
intensive care unit admission due to asthma, (Tr. 217), and in June
of 2005, plaintiff's asthma was severe and persistent, but
"stable." (Tr. 243.) While the lack of objective medical evidence
is not dispositive, it is an important factor, and the ALJ is
entitled to consider the fact that there is no objective medical
evidence to support the degree of alleged limitations.  20 C.F.R.
§§ 404.1529(c)(2), 416.929(c)(2); Kisling v. Chater, 105 F.3d 1255,

1257-58 (8th Cir. 1997); <u>Cruse</u>, 867 F.2d at 1186 (the lack of objective medical evidence to support the claimant's allegations of disabling symptoms is a factor to be considered).

While the record does contain numerous contemporaneous medical records documenting plaintiff's regular follow-up treatment for asthma, the records do not indicate that plaintiff ever required emergency medical treatment or hospitalization for asthma. Furthermore, as noted above, plaintiff continued to perform household duties and go outdoors, and also regularly drove herself to attend church meetings, despite her claims that even moderate exposure to environmental irritants such as perfume, exhaust fumes, asphalt, soaps and detergents, and carpet odors would cause severe respiratory symptoms. While plaintiff did indeed complain regularly to her doctors about her asthma symptoms, the ALJ acknowledged this in her decision, correctly found plaintiff's asthma to be a severe impairment, and imposed an appropriate restriction on plaintiff to avoid concentrated exposure to fumes, odors, dust, gases, and poor ventilation.

Plaintiff argues that Dr. Sultan's February 2007 letter supports the conclusion that plaintiff must avoid even moderate exposure to environmental irritants. While Dr. Sultan did indicate that plaintiff reported that exposure to various environmental irritants exacerbated her symptoms, Dr. Sultan did not say in that report that plaintiff must avoid even moderate exposure to such irritants. In fact, as the Appeals Council noted, Dr. Sultan

-49-

provided no specific clinical findings reflecting plaintiff's functional limitations. Dr. Sultan's conclusory statements that plaintiff was unable to return to her past work and that she was totally disabled are not entitled to controlling weight, and do not support plaintiff's argument. See Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005) (medical opinion that applicant is disabled or unable to work involves issue reserved for Commissioner and is not type of medical opinion to which Commissioner gives controlling weight). The record documents that plaintiff, in her daily life, chose to regularly expose herself to environmental irritants, and the majority of plaintiff's medical treatment records do not indicate that she was advised to limit her exposure to environmental irritants to any extent not recognized by the ALJ. See Hensley, 352 F.3d at 357 (the absence of functional restrictions placed on claimant's activities was inconsistent with a claim of disability); see also Brown v. Chater, 87 F.3d at 964-65 (lack of significant restrictions imposed by treating physicians supported ALJ's decision that claimant was not disabled.) The ALJ in this case reviewed the medical evidence of record, found that plaintiff's asthma was a severe impairment, considered that impairment in determining plaintiff's RFC, and included restrictions therein regarding exposure to environmental irritants. The record supports that decision.

The Appeals Council also indicated that it considered Mr. England's July 24, 2007 Vocational Rehabilitation Evaluation, and

the undersigned will consider whether the ALJ's decision is supported by substantial evidence on the record as a whole, which now includes Mr. England's Vocational Rehabilitation Evaluation. Gartman, 220 F.3d at 922 (citing Kitts, 204 F.3d at 786; see also Richmond, 23 F.3d at 1444 (Court must review evidence considered by Appeals Council and determine "whether there is substantial evidence in the administrative record, which now includes the new evidence, to support the ALJ's decision.")[34]

As plaintiff indicates in her summary of the medical evidence, Mr. England found that plaintiff would need to avoid mold, cats, and irritants such as air fresheners. Mr. England also noted that plaintiff had extreme difficulty according to a note from the Davis Clinic, and that she had severe chemical sensitivity which affected her both physically and mentally. Review of Mr. England's report, however, reveals that it does not provide a basis for changing the ALJ's decision, and that substantial evidence, which now includes Mr. England's report, supports the ALJ's decision. First, while Mr. England did include many of his own observations in his report, it appears that the majority of his conclusions are based upon medical information that the ALJ reviewed and determined did not support plaintiff's allegations of

---

[34]In the "Legal Argument" portion of her brief, plaintiff makes no attempt to argue that Mr. England's report would have changed the ALJ's decision, and mentions it only in the recitation of the medical records. However, the undersigned notes that, during the September 10, 2009 hearing held in this matter, plaintiff's counsel indicated that, while he wished to stand on the briefs filed in this matter, he believed that Mr. England's July 24, 2007 Vocational Rehabilitation Evaluation supported plaintiff's claim.

total disability. In addition, much of the medical information Mr. England reviewed pre-dated May 26, 2004. Because much of the evidence Mr. England relied upon predated the relevant period of time, and inasmuch as the ALJ herself reviewed the same medical evidence that Mr. England relied upon, it cannot be said that the ALJ would have changed her opinion had she reviewed Mr. England's report. The undersigned concludes that the ALJ's determination is supported by substantial evidence on the record as a whole, Mr. England's report included.

The undersigned notes that plaintiff, in her brief, makes a passing reference to the ALJ's determination that plaintiff's fibromyalgia was not a medically determinable impairment. While plaintiff makes no arguments specifically directed towards the ALJ's determination regarding plaintiff's fibromyalgia, the undersigned will briefly address this portion of the ALJ's decision. In her decision, as noted above, the ALJ conducted an exhaustive review of the medical information of record, and determined that, while a physician's assistant assessed plaintiff as having fibromyalgia, the medical records in the file did not document it. In so finding, the ALJ noted that there was no tender point evaluation that would support a finding that plaintiff truly has fibromyalgia, and noted that the medical records also failed to document significant loss of range of motion, strength, reflex, motor deficit, muscle atrophy due to disuse, or severe persistent muscle spasm. The ALJ's conclusion that plaintiff did not have the

medically determinable impairment of fibromyalgia is supported by substantial evidence on the record as a whole. See Strongson v. Barnhart, 361 F.3d 1066, 1072 (8th Cir. 2004) (ALJ properly discredited claimant's allegations of fibromyalgia when, inter alia, there was no evidence that a trigger point evaluation supported such claim). An ALJ is entitled to consider the fact that the record lacks medical evidence to support the claimant's allegations of a disabling condition. 20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2); Kisling, 105 F.3d at 1257-58; Cruse, 867 F.2d at 1186 (the lack of objective medical evidence to support the claimant's allegations of disabling symptoms is a factor to be considered).

The undersigned also notes that the ALJ in this case determined that plaintiff's obesity was a severe impairment, and properly considered this impairment in conjunction with her RFC assessment. When obesity is identified as a medically determinable impairment, functional limitations associated with it must be considered when determining a claimant's RFC. Social Security Ruling 02-01p, 2000 WL 628049, at *7. In this case, the ALJ specifically noted that she had considered plaintiff's obesity, and noted that the record contained no evidence that plaintiff's obesity resulted in severe symptoms with limitations of function for twelve consecutive months. The ALJ in this case properly considered plaintiff's obesity. See Brown ex rel. Williams v. Barnhart, 388 F.3d 1150, 1153 (8th Cir. 2004) (finding that the ALJ

sufficiently considered a claimant's obesity where the ALJ specifically referred to such obesity in his decision.)

Review of the ALJ's RFC determination, which was adopted by the Appeals Council and is thus part of the Commissioner's final decision, reveals that she properly exercised her discretion and acted within her statutory authority in evaluating the evidence of record as a whole. This Court will therefore not reverse the Commissioner's decision, even though the record may contain substantial evidence supporting a different outcome, or even if this Court would have made a different decision. See Dunahoo v. Apfel, 241 F.3d 1033, 1037 (8th Cir. 2001) (if substantial evidence supports the Commissioner's decision, we will not reverse because substantial evidence also supports a different outcome, even if we would have reached a different conclusion.)

As discussed above, plaintiff's argument that the ALJ erred at step five of the sequential evaluation process by improperly relying upon the Medical-Vocational Guidelines is not the Commissioner's final decision, and is therefore not subject to review. Sims, 530 U.S. at 106-107 (if the Appeals Council grants review of a claim, then the decision that the Council issues is the Commissioner's final decision); see also Browning, 958 F.2d at 822 (statutory jurisdiction is confined to review of the Commissioner's final decision). Plaintiff challenges no other aspect of the Commissioner's final decision.

Therefore, for all of the foregoing reasons,

**IT IS HEREBY ORDERED** that the decision of the Commissioner be affirmed, and plaintiff's Complaint be dismissed with prejudice.

_____
Frederick R. Buckles
UNITED STATES MAGISTRATE JUDGE

Dated this 25th day of September, 2009.